Connor M. Mannion, Esq.
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
201-489-3000
201-489-1536 Facsimile
*Attorneys for Plaintiff, American Neighborhood*
*Mortgage Acceptance Company, LLC.*

| | |
|---|---|
| AMERICAN NEIGHBORHOOD MORTGAGE ACCEPTANCE COMPANY LLC, d/b/a ANNIEMAC HOME MORTGAGE<br><br>               Plaintiff<br><br>   v.<br><br>MONA LEA EDICK, DESPINA NOVAKIDOU**,** and STACEY LEMMAGE<br><br>               Defendants | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY<br><br>**Case No. 1:25-cv-01563-RMB-SAK**<br><br>**FIRST AMENDED COMPLAINT** |

## FIRST AMENDED COMPLAINT

Plaintiff, American Neighborhood Mortgage Acceptance Corporation LLC ("AnnieMac" or the "Company"), domiciled at 700 E Gate Dr, Suite 400, Township of Mt. Laurel, County of Burlington, State of New Jersey, complaining of Defendants Mona Lea Edick, Despina Novakidou, and Stacey Lemmage, states as follows:

### INTRODUCTION

1.    AnnieMac hired Edick as an Originating Regional Manager in February 2024, offering a $500,000 signing bonus contingent on her employment for 36

months. AnnieMac later discovered that Edick, with Novakidou and Lemmage's help, used fraudulent information to qualify borrowers for mortgage loans. Consequently, AnnieMac terminated Edick and demanded repayment of the bonus, which Edick refused. AnnieMac is now seeking to recover the bonus and damages caused by Defendants' fraudulent actions.

PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff AnnieMac is a Delaware limited liability company domiciled in Mt. Laurel Township, Burlington County, New Jersey. AnnieMac has two members. The first is an individual domiciled in New Jersey. The second is a limited liability company with a single member domiciled in Puerto Rico. Therefore, AnnieMac is deemed to be a citizen of Puerto Rico and New Jersey, only, for purposes of diversity jurisdiction.

3.      Defendant Mona Lea Edick ("Edick") is an individual who, at all relevant times, was employed by AnnieMac for purposes of managing the branch located at 4210 Del Prado Blvd South, Suite 1,2,3, Cape Coral, Florida (the "Florida Branch"). Subsequently, Edick was also assigned to manage the branch located at 20980 Rogers Drive, Suite 400, Rogers, Minnesota (the "Minnesota Branch").

4.      At all relevant times, Edick was and remains domiciled in the City of Cape Coral, County of Lee in the State of Florida.

5.     At all relevant times, Edick was subject to a Sign-On Bonus Agreement ("Bonus Agreement") dated February 1, 2024, a copy of which is attached hereto as **Exhibit A**.

6.     Edick consented to jurisdiction in New Jersey when she signed the Bonus Agreement, which provides, in pertinent part:

> This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (without regard to any conflicts of laws principles thereof that would give effect to the laws of another jurisdiction). Employee intends to and hereby confers jurisdiction upon the courts of the State of New Jersey and U.S. federal courts located within the State of Jersey to determine any dispute arising out of or related to this Agreement, including the enforcement and the breach hereof. Employee waives any objection to venue in such courts. [Exhibit A, Bonus Agreement, Sec. 3 (emphasis supplied).]

7.     Defendant Despina Novakidou ("Novakidou") is an individual who, at all relevant times, was employed by AnnieMac as a Loan Partner and who is domiciled in the city of Cape Coral, County of Lee in the State of Florida.

8.     Defendant Stacey Lemmage ("Lemmage") is an individual who, at all relevant times, was employed by AnnieMac as a Loan Processor.

9.     At all relevant times Lemmage resided in Maple Grove, County of Hennepin in the State of Minnesota, where she is currently domiciled. Lemmage's duties included regularly assisting Edick with the origination of mortgage loans for

borrowers located in Florida and Minnesota regarding properties also located in those states, and Lemmage regularly performed such duties.

10.    At all relevant times, Defendants directed their actions toward AnnieMac.

11.    Defendant's actions impacted AnnieMac at its headquarters in New Jersey, by, among other things, requiring personnel at AnnieMac's headquarters to audit loan files, report defective loans to investors, process and respond to investor demands to repurchase the loans or enter into indemnification agreements, and it is the location that suffered the impact of losses from Edick's loans.

12.    Defendants submitted information to AnnieMac relating to the mortgage loan applications, including information submitted to AnnieMac's computerized loan origination system ("LOS"), which is maintained in New Jersey.

13.    AnnieMac's mortgage loan underwriters access the information stored in the LOS in New Jersey when reviewing the loan application and supporting materials to determine whether AnnieMac should approve and fund a mortgage loan.

14.    Loan underwriters work remotely, but they access the LOS in New Jersey to review the loan applications and supporting documents for the loans described in this complaint.

15.    The loans and fraudulent application materials involved in this case were underwritten by underwriters from New Jersey, Colorado, Virginia, Indiana,

and Georgia, all of whom accessed the materials at AnnieMac's central LOS in New Jersey.

16.     Personnel at AnnieMac's New Jersey headquarters oversee the funding of loans, the subsequent sale of the mortgage loans to investors on the secondary market, and the handling of any defective loans for which an investor demands a repurchase or otherwise asserts damages.

17.     AnnieMac sold Edick's originated loans on the secondary market to various investors. As a result of Defendants' actions, AnnieMac has been required to self-report the loans to respective investors as defective, resulting in further damages to AnnieMac in the form of having to repurchase loans or being unable to sell loans at market value.

18.     Venue is proper in this Court because (a) it is where a substantial part of the events or omission giving rise to the claim occurred, (b) each Defendant's actions were directed toward AnnieMac's headquarters in New Jersey, (c) the injury or damage to AnnieMac was felt in New Jersey, and (d) Edick agreed in the Bonus Agreement that venue in this Court is proper.

19.     This Court has subject matter jurisdiction because the parties are citizens of different states and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## GENERAL ALLEGATIONS

20.     AnnieMac is a national company with its headquarters located in New Jersey.

21.     AnnieMac is in the business of originating and servicing residential mortgage loans and providing related services to borrowers, including mortgage financing and refinancing services.

22.     On February 1, 2024, AnnieMac hired Edick as the Originating Regional Manager of AnnieMac's Florida Branch and subsequently also assigned her to manage the Minnesota Branch.

23.     When AnnieMac hired Edick, she executed an Originating Regional Manager Agreement and the Bonus Agreement, the latter providing that Edick would receive a signing bonus (the "Bonus") of $500,000.00 payable in ten installments of $50,000.00 each. Exhibit A, Bonus Agreement.

24.     AnnieMac has paid Edick all ten of the $50,000.00 installment payments for a total of $500,000.00.

25.     The Bonus Agreement required Edick to repay the full amount of the Bonus if her employment with AnnieMac terminated within 36 months of her start date. Exhibit A, Bonus Agreement, Sec. 2.

26.    On February 1, 2024, at Edick's request, AnnieMac hired Novakidou as a Loan Partner II. Novakidou had worked with Edick at her previous employer, Bay Equity Homes.

27.    On February 1, 2024, at Edick's request, AnnieMac hired Lemmage as a Loan Processor. Lemmage had worked with Edick at her previous employer, Bay Equity Homes.

28.    As an Originating Regional Manager, Edick's duties included the origination of mortgage loans and the supervision and management of other loan originators and staff at the Florida and Minnesota Branches, including but not limited to Novakidou and Lemmage.

29.    In performing her duties, Edick was required to comply with all AnnieMac policies and applicable law.

30.    The process of originating mortgage loans required Edick, Novakidou, and Lemmage to assist prospective borrowers and referring third parties, such as real estate agents.

31.    As a regional manager and mortgage loan originator, Edick was the primary point of contact for many borrowers and was responsible for the accuracy and completeness of loan applications and supporting documents received from borrowers.

32.    Edick, Novakidou, and Lemmage were responsible for gathering information from prospective borrowers regarding, among other things, employment, income, assets, and debts, and submitting this information to AnnieMac's independent underwriting department to determine whether the borrower qualified for a mortgage loan.

33.    Before submitting a loan application and supporting documentation to AnnieMac's underwriting department, Edick was responsible for evaluating each borrower's credibility and any supporting documentation for accuracy and veracity.

34.    Edick's compensation was based, in part, on commissions from each mortgage loan that she successfully closed.

### *The Fraudulent Acts*

35.    Approximately eight months after AnnieMac hired Edick, Novakidou, and Lemmage, the company became concerned about possible fraud relating to loans Edick had originated.

36.    AnnieMac reviewed a sample of loan files and related materials regarding loan applications originated by Edick, with the assistance of Novakidou and/or Lemmage, including the following loans (collectively, the "Loans"):

| Loan | Application Date | State of Property |
|------|-----------------|-------------------|
| Loan 9743 | 8/27/2024 | Florida |
| Loan 6846 | 2/13/2024 | Florida |
| Loan 1582 | 6/28/2024 | Florida |
| Loan 3281 | 3/11/2024 | Minnesota |
| Loan 7258 | 2/7/2024 | Florida |
| Loan 7159 | 2/15/2024 | Florida |
| Loan 9608 | 6/28/2024 | Florida |
| Loan 7726 | 2/18/2024 | Florida |
| Loan 6817 | 4/11/2024 | Minnesota |
| Loan 1844 | 3/13/2024 | Florida |
| Loan 7076 | 4/12/2024 | Minnesota |
| Loan 5346 | 6/4/2024 | Minnesota |
| Loan 0078 | 4/30/2024 | Florida |

37.    AnnieMac discovered considerable evidence of fraud among the Loans, including but not limited to the following (the "Fraudulent Acts"):

a.    Edick, with assistance from Lemmage and Novakidou, knowingly submitted loan applications with false information regarding borrower employment and income to AnnieMac's underwriting department through the LOS;

b.      Edick, with assistance from Lemmage and Novakidou, coached or otherwise instructed potential borrowers on how to revise prior tax returns to misrepresent their income;

c.      Edick, with assistance from Lemmage and Novakidou, knowingly received and submitted false documentation regarding borrower income, assets, and employment to AnnieMac's underwriting department through the LOS;

d.      Edick, with assistance from Lemmage and Novakidou, coached or otherwise assisted potential borrowers in misrepresenting their income, assets, and employment;

e.      Edick, with assistance from Lemmage and Novakidou, coached or otherwise guided potential borrowers to misrepresent their employment status as being employed by bogus family businesses rather than report their self-employment; and

f.      Edick, with assistance from Lemmage and Novakidou, sought to delete and conceal accurate information regarding loan applications that she originated while employed by AnnieMac.

38.    AnnieMac discovered that Edick frequently utilized the same loan processors, real estate agent, and accounting firms to assist in committing the Fraudulent Acts.

39.    AnnieMac also discovered that Novakidou and Lemmage acted in concert with Edick to perpetrate the Fraudulent Acts.

### Audit of Specific Loan Files

40.    AnnieMac discovered serious defects among the Loans, including evidence of fraud, as described in greater detail below.

### Loan 9743

41.    Edick originated Loan 9743 in or around August 2024 relating to a property in Florida.

42.    The borrower submitted W-2s identifying $21,800.00 in employment income for 2023.

43.    The $21,800.00 in alleged employment income did not appear on the borrower's previously filed tax returns for 2023.

44.    Edick knew about both the 2023 W-2s and the 2023 tax returns shortly after they were submitted to her.

45.    Edick knew the W-2s were fraudulent or acted with reckless disregard of the truth.

46.    Rather than refuse to originate the loan, Edick sent an email on August 29, 2024, to the borrower's real estate agent, suggesting that the borrower amend his tax returns to include the alleged $21,800.00 in employment income to falsely inflate the borrower's income.

47.    To further mispresent the borrower's debt-to-income ratio to qualify him for the loan, Edick recommended to the same real estate agent that the borrower reclassify an automobile loan as a business expense to reduce the borrower's debt-to-income ratio, even though the automobile loan is not included in that business's financial statements.

*Loan 6846*

48.    Edick originated Loan 6846 in or about February 2024, with assistance from Lemmage and Novakidou, relating to property in Florida.

49.    The Defendants inflated the borrower's reported income to assist him in qualifying for the mortgage loan.

50.    The borrower's reported income of $16,249.58 per month was not supported by the borrower's bank statements.

51.    In addition, the amount of time the borrower had been self-employed was misrepresented.

52.    The Defendants knew both the reported income and the amount of time the borrower was self-employed was false or acted with reckless disregard of the truth.

53.    AnnieMac was required to self-report the loan to the investor, which subsequently issued a demand requiring AnnieMac to repurchase the loan.

*Loan 1582*

54.    Edick originated Loan 1582, with the assistance of Novakidou, in or around March 2024 relating to property in Florida.

55.    The borrower's loan application identifies $8,019.00 in monthly income.

56.    However, the borrower's bank statements do not reflect that income, and his tax return for the prior year showed an adjusted gross income of only $38,229.00.

57.    Edick and Novakidou knew the reported income was false or acted with reckless disregard of the truth.

58.    As a result of the fraudulently inflated income, AnnieMac was required to self-report the loan to the investor, and the investor has demanded that AnnieMac repurchase the loan.

*Loan 3281*

59.    Edick originated Loan 3281 in or around July 2024 regarding a property located in Minnesota.

60.    Edick concealed or failed to disclose that the borrower had created bogus records of rent revenues to support a mortgage loan for a multi-family building.

61.    Further, Edick substantially inflated the borrower's income, representing to AnnieMac in the loan file on August 1, 2024 that the borrower "just got promotion to manager," even though prevailing wages for the borrower's position were substantially less than the reported amount and inconsistent with the borrower's previous wages.

*Loan 7258*

62.    Edick attempted to originate Loan 7258 in or around June 2024 regarding a property located in Florida.

63.    Edick, with assistance from Lemmage and Novakidou, submitted false income documentation from the borrower, including multiple letters from an accounting firm regarding the financial status of a family business.

64.    However, the accounting firm later reported only sending one letter.

65.    In an email sent August 14, 2024, from Lemmage to Novakidou and Edick, Lemmage admits that the borrower had not been self-employed for five years.

66.    Nonetheless, Edick allowed the borrower to submit false documentation attempting to show self-employment of at least five years to avoid the need to produce additional income documentation for additional years.

67.    Moreover, Novakidou provided false information to AnnieMac's Executive Vice President of Operations when questioned about the transaction.

*Loan 7159*

68.    Edick, with the assistance of Lemmage, originated Loan 7159 in or around February 2024 regarding a property in Florida.

69.    Upon reviewing the loan file, AnnieMac found that the borrower's reported income was not supported by sufficient documentation and the income was inflated for purposes of qualifying for a mortgage loan.

70.    Edick and Novakidou knew the reported income was false or acted with reckless disregard of the truth.

71.    As a result, AnnieMac was forced to self-report the loan to the investor.

*Loan 9608*

72.    Edick, with the assistance of Lemmage, attempted to originate Loan 9608 in or around June 2024 regarding a property in Florida.

73.    After learning what self-employment income would support approval of the loan, Edick, with the assistance of Lemmage, coached the borrower to submit amended tax returns, falsely increasing the borrower's income approximately six-fold from the income reported when the returns were originally filed.

74.    Edick, with the assistance of Lemmage, also submitted a letter allegedly from an accounting firm in support of the falsely inflated self-employment income.

*Loan 7726*

75.    Edick, with assistance from Lemmage and Novakidou, originated Loan 7726 in or around February 2024 regarding a property located in Florida.

76.    After the loan closed, AnnieMac discovered that the borrower's initial income verification documents had been excluded from the loan application before it was submitted to underwriting.

77.    The excluded documentation included paychecks and tax returns showing a lower income than was reported on the loan application.

78.    In place of the excluded documentation, Edick created a false work verification of income ("WVOE") that failed to disclose the borrower's status as a contract employee, which would have adversely affected the borrower's chances of being approved for the loan.

79.    Novakidou and Lemmage assisted Edick in securing the false WVOE from the borrower's employer knowing it was false or with reckless disregard of the truth.

80.    AnnieMac was forced to self-report the loan to the investor, which in turn demanded that AnnieMac repurchase the loan.

*Loan 6817*

81.    Edick, with assistance from Novakidou, took an application for Loan 6817 in or around April 2024 regarding a property in Minnesota.

82.    Together, they attempted to use a falsified WVOE to inflate the borrower's length of employment and income.

83.    Edick attempted to delete documents from the loan file that were inconsistent with the falsified documentation, but she failed to do so.

84.    On September 11, 2024, Edick sent an email to Novakidou telling her to "just push" the application through underwriting, despite the inflated income.

85.    As a result of Edick and Novakidou's actions, AnnieMac was forced to self-report the loan to the investor, which required AnnieMac to sign an indemnification agreement for any damages resulting from the defective loan.

*Loan 1844*

86.    Edick started Loan 1844 in or around March 2024, assisted by Lemmage and Novakidou.

87.    The borrower was a manicurist who had previously reported income of $8,400.00 for 2023.

88.    On April 24, 2024, Edick wrote a memo to the loan file stating that the borrower had recently switched jobs and listed the borrower's income and work history, claiming that the borrower was now making $5,800.00 per month.

89.    Edick submitted a WVOE to AnnieMac that claimed the borrower had obtained a position at a different company earning $76,000.00 per year, or $6,333.00 per month.

90.    Edick knew the reported income and WVOE were false or acted with reckless disregard of the truth.

91.    Edick's actions required AnnieMac self-report the loan to the investor.

*Loan 7076*

92.    Edick, with assistance from Lemmage, started Loan 0706 in or around May 20, 2024, regarding a property in Minnesota.

93.    The borrower's original loan application indicated that she was not employed.

94.    Edick and Lemmage subsequently represented the borrower was employed and had recently received a promotion at work earning $43.75 per hour.

95.    After the loan closed, AnnieMac's quality control team sought to re-verify the borrower's earnings.

96.    AnnieMac's quality control team discovered that the borrower's actual rate of pay was only $18.00 per hour, resulting in a monthly income of only $3,011.50.

97.    Edick and Lemmage knew the reported income was false or acted with reckless disregard of the truth.

98.    As a result of the fraudulent inflated income, AnnieMac was required to self-report the loan to the investor.

*Loan 5346*

99.    Edick started this FHA loan in or around June 2024 relating to a property in Minnesota.

100.    The borrower/purchaser was purchasing the property from a limited liability company owned by Edick's spouse.

101.    Further, the borrower/purchaser was the brother-in-law of Edick's spouse.

102.    Edick's spouse was also the real estate agent responsible for listing the property for sale.

103.    Initially, the loan documents for the FHA loan failed to disclose the familial relationship between the borrower/purchaser and seller.

104.    Moreover, the property appraisal Edick submitted to underwriting with the loan application stated that the seller had occupied the property prior to the sale to borrower/purchaser.

105.    Photographs of the property taken before the sale indicate that the property had was vacant before the sale.

106.    Edick knew that the property was not occupied by the seller prior to the sale date.

107.    Edick and her spouse each benefited from the sale.

108.   As a result of these defects, the investor required AnnieMac to sign an indemnity agreement regarding any losses associated with the loan.

*Loan 0078*

109.   Edick originated Loan 0078 in or around April 2024, with the assistance of Lemmage and Novakidou, relating to a property in Florida.

110.   The borrower's income, as stated on the loan application, does not match the business income shown on the borrower's tax transcripts.

111.   The borrower's income on the loan application was overstated to qualify the borrower for the loan.

112.   As a result, AnnieMac was forced to self-report the defective loan to the investor, who has in turn demanded that AnnieMac repurchase the loan.

**Freddie Mac's Notice of Fraud Investigation**

113.   On November 14, 2024, AnnieMac received a notice from the Federal Home Loan Mortgage Corporation ("FHLMC" of "Freddie Mac") regarding mortgage loans it had purchased from AnnieMac.

114.   Freddie Mac purchases closed mortgage loans from AnnieMac under an agreement that requires AnnieMac to repurchase the loans if the loan file includes evidence of fraud.

115.   Freddie Mac's written notice identified at least three loans originated by Edick that Freddie Mac is investigating for fraud, including Loan 7726.

### *Defendants' Aimed Their Tortious Conduct at AnnieMac in New Jersey and AnnieMac Felt and Will Continue to Feel the Brunt of the Harm in New Jersey*

116.   The Fraudulent Acts created significant liability for AnnieMac, because, among other things, AnnieMac is required to repurchase any loans it has sold to investors where the loan was approved based on fraudulent information or documentation.

117.   In many cases, AnnieMac is required to self-report defective to investors when AnnieMac discovers defects such as fraud in the origination of said loans, which can lead to a repurchase demand or requirement that AnnieMac agree to indemnify the investor for losses related to the defective loans.

118.   Personnel at AnnieMac's headquarters in New Jersey have been forced to respond to disgruntled investors as well as participate in investigations regarding Defendants' conduct.

119.   In addition to repurchasing loans that were based on fraudulent documentation, AnnieMac's business reputation has been harmed.

120.   AnnieMac has been required to execute indemnification agreements regarding some of the Loans, agreeing to be liable for any damages that may result from Defendants' Fraudulent Actions.

121.   AnnieMac has or will be required to repurchase some loans from investors.

122.   To the extent that AnnieMac has retained loans that were originated based on Defendants' fraud and misconduct, AnnieMac has suffered damages to the extent that those loans cannot be sold at prevailing market rates.

### *AnnieMac Terminates the Defendants*

123.   After learning of Defendants' fraudulent and otherwise unlawful conduct, on November 14, 2024, AnnieMac terminated Edick for cause.

124.   On November 18, 2024, AnnieMac terminated Novakidou and Lemmage for failure to follow company policy and industry standards.

125.   Upon her termination, AnnieMac demanded that Edick repay the $500,000.00 bonus, because she had not worked for 36 months as required under the Bonus Agreement.

126.   Edick failed and refused to repay the Bonus as required by the Bonus Agreement.

## COUNT I
## BREACH OF SIGN-ON BONUS AGREEMENT
### (AS TO DEFENDANT EDICK)

127.   AnnieMac incorporates the allegations set forth in paragraphs 2 through 126 as if fully stated below.

128.   The Bonus Agreement provides that AnnieMac shall pay Edick $500,000.00 (the "Bonus") in ten installments in the amount of $50,000. Exhibit A, Bonus Agreement, Sec. 2.

129.   The Bonus Agreement further provides that the Bonus is an "unvested wage advance." Exhibit A, Bonus Agreement, Sec. 2.

130.   The Bonus Agreement further states, in pertinent part:

> Employee will earn the advance in its entirety by remaining employed with Company for thirty-six (36) months following the Start Date. **The Parties further agree that no portion of the advance shall be earned if Employee does not remain employed with Company for the full thirty-six (36) months.** Stated differently, if Employee does not remain employed with Company for thirty-six (36) months, Company may require Employee to pay back the bonus in full pursuant to paragraph 3, below. Time of employment less than thirty-six (36) months, including partial months of employment, does not reduce the repayment obligation under this Agreement. [Exhibit A, Bonus Agreement, Sec. 2 (emphasis in original).]

131.   Pursuant to the terms of the Bonus Agreement, if Edick failed to remain in AnnieMac's employ for at least 36 months, she would be required to repay the Bonus to the company. Specifically, the pertinent provision of the Bonus Agreement provides:

> If Employee separates from employment with Company, regardless of the reason, whether voluntary or involuntary, prior to thirty-six (36) months after the Start Date, then Employee agrees to repay the entire unvested wage advance portions of the Bonus within ten (10) days of the separation date. Employee further agrees that any outstanding balance on such repayment obligation is delinquent and immediately collectable following the

tenth (10th) day after the separation date. [Exhibit A, Sign-On Bonus, Sec. 2(a).]

132.  Edick separated from AnnieMac on November 14, 2024, when AnnieMac terminated her for cause.

133.  Edick separated from AnnieMac less than 36 months from her start date of February 1, 2024.

134.  Because Edick separated from AnnieMac prior to the expiration of the required 36-month period of employment, she is required to repay the amount of the Bonus, which is $500,000.00.

135.  AnnieMac demanded that Edick repay the Bonus.

136.  Edick has failed and refused to repay the Bonus as required under the Bonus Agreement.

137.  Edick's failure and refusal to repay the Bonus constitute a breach of her obligations under the Bonus Agreement.

138.  Edick agreed in the Bonus Agreement that she would pay all AnnieMac's reasonable costs, expenses, interest, and legal fees incurred in enforcing the Bonus Agreement. Exhibit A, Sec. 11.

139.  AnnieMac has been damaged by Edick's breach of the Bonus Agreement.

140.  WHEREFORE, AnnieMac prays for relief as set forth below.

## COUNT II
## BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
### (AS TO DEFENDANT EDICK)

141.   AnnieMac incorporates the allegations set forth in paragraphs 2 through 126 as if fully stated below.

142.   Edick was an originating regional manager and mortgage loan originator for AnnieMac and as such owed fiduciary duties to AnnieMac, as well as a duty of loyalty.

143.   In committing the Fraudulent Acts, Edick did not exercise the care required of a regional manager or mortgage loan originator, in that she used her position of trust and confidence to further her own interest, and in doing so caused injury to AnnieMac.

144.   As a result of Edick's wrongful conduct, AnnieMac has suffered and continues to suffer economic loss and other general and specific damages, including, but not limited to, commissions paid in connection with loans that would not have closed but for Edick's wrongful conduct, damage to business reputation, lost profits, and lost revenue, in an amount to be determined according to proof at the time of trial.

145.   Edick committed the wrongful acts maliciously, oppressively, and with intent to defraud and permanently deprive AnnieMac of its economic benefits.

146.    AnnieMac is entitled to punitive and exemplary damages in an amount to be ascertained according to proof at the time of trial, which is appropriate to punish and set an example.

147.    WHEREFORE, AnnieMac prays for relief as set forth below.

## COUNT III
## FRAUD
### (AS TO ALL DEFENDANTS)

148.    AnnieMac incorporates the allegations set forth in paragraphs 2 through 126 as if fully stated below.

149.    Defendants' Fraudulent Acts, as more specifically pled above, constitute a series of material representations of a presently existing or past fact.

150.    Further, Edick's and the other Defendants' repeated failure to disclose to AnnieMac the falsity of information and documentation submitted by borrowers, realtors, or accountants constitutes misrepresentation by omission, and Edick owed a fiduciary duty to AnnieMac to make such disclosures.

151.    Defendants made the material representations and omissions with knowledge of their falsity.

152.    Defendants intended that AnnieMac rely on their material misrepresentations and omissions.

153.    AnnieMac relied on Defendants' misrepresentations to its detriment by, among other things, funding the fraudulent mortgage loans originated by

Defendants, paying Edick commissions on each mortgage, and – in some cases – selling the mortgage loans to third parties.

154.   At the time of Defendants' Fraudulent Acts, AnnieMac was ignorant of the actions being undertaken by Defendants and believed that Defendants were acting in the best interests of AnnieMac and relied upon Defendants' Fraudulent Acts when continuing to employ and compensate Defendants.

155.   AnnieMac did not discover Defendants' Fraudulent Acts, which they had fraudulently concealed, until after reviewing a sample of the loan applications and related materials submitted by Defendants for underwriting and funding.

156.   AnnieMac has been damaged by its reliance on Defendants' misrepresentations and omissions in an amount that exceeds $75,000.00.

157.   WHEREFORE, AnnieMac prays for relief as set forth below.

## COUNT IV
## CONSPIRACY
### (AS TO ALL DEFENDANTS)

158.   AnnieMac incorporates the allegations set forth in paragraphs 2 through 126 as if fully stated below.

159.   Defendants entered into an agreement with each other and/or with other parties whose identities are presently unknown, but whose identities are within the superior knowledge of Defendants, with a common design to undertake the

Fraudulent Acts specifically described above for the unlawful purpose of defrauding AnnieMac.

160.   Each Defendant acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means as follows:

      a.   Defendants committed tortious acts, including but not limited to fraud, in concert with each other, pursuant to a common design;

      b.   Each Defendant knew that each other's conduct constituted fraud;

      c.   Each Defendant knew that their individual conduct constituted a breach of their respective duties to AnnieMac;

      d.   Each Defendant provided substantial assistance and encouragement to the others to commit said fraud and breach of duties; and

      e.   Each Defendant's conduct, separately considered, constituted an overt act and constitutes a breach of their respective duties to AnnieMac.

161.   AnnieMac suffered harm as the result of Defendants' overt actions constituting illegal fraud.

162.   Edick, Novakidou and Lemmage performed the Fraudulent Acts in concert with each other and other unknown parties pursuant to a common design.

163. In addition, Defendants knew that their actions were in furtherance of fraud as well as Edick's breach of her fiduciary duty and duty of loyalty to AnnieMac.

164. Novakidou and Lemmage each gave substantial assistance to Edick in perpetrating the Fraudulent Acts and Edick's breach of her fiduciary duties and duty of loyalty.

165. Edick, Novakidou and Lemmage each knew their respective conduct, separately considered, constituted fraud and contributed to the breach of Edick's fiduciary duties and her duty of loyalty to AnnieMac.

166. Edick, Novakidou and Lemmage are jointly and severally liable for the damages AnnieMac suffered because of Edick's tortious conduct.

167. AnnieMac is entitled to punitive and exemplary damages in an amount to be ascertained according to proof at the time of trial, which is appropriate to punish and set an example.

168. WHEREFORE, AnnieMac prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, AnnieMac prays for relief as follows:

A. For damages in the amount of $500,000.00 against Edick, representing the amount of the Bonus;

B. For additional compensatory and general damages according to proof;

C.      For special damages according to proof;

D.      For consequential damages according to proof;

E.      For prejudgment interest at the maximum legal rate;

F.      For punitive and exemplary damages according to proof;

G.      For attorneys' fees pursuant to the Bonus Agreement;

H.      For costs of the proceedings herein; and

I.      For all other relief that this Court finds just and proper.


Dated: June 27, 2025

                                Cole Schotz
                                Court Plaza North
                                25 Main Street
                                Hackensack, NJ 07601
                                P: 208-525-6274
                                Email: cmannion@coleschotz.com

                                */s Connor M. Mannion*
                                Connor M. Mannion
                                NJ Atty ID #334482021
                                Attorneys for American Neighborhood
                                Mortgage Acceptance Company, LLC

# EXHIBIT A – BONUS AGREEMENT

DocuSign Envelope ID: D5611A0C-4003-4735-A241-EE24715D8A98

# SIGN-ON BONUS AGREEMENT

This Sign-On Bonus Agreement (the "**Agreement**") is entered into this 1st day of February 2024 (the "**Effective Date**") by and between American Neighborhood Mortgage Acceptance Company LLC, d/b/a AnnieMac Home Mortgage, a Delaware limited liability company ("**Company**") and Mona Lea Edick (the "**Employee**") (Company and Employee may be individually referred to as a "**Party**" and collectively referred to as the "**Parties**").

**WHEREAS,** Company desires to bestow upon the Employee a sign-on bonus in consideration for Employee accepting employment with the Company and remaining satisfactorily employed for no less than thirty-six (36) months.

**NOW, THEREFORE,** in consideration thereof and of the covenants hereafter set forth, the Parties hereby agree as follows:

1.      **Incorporation of Recitals.** The above recitals are incorporated herein by this reference.

2.      **Sign-On Bonus Payment.** Company agrees to pay Employee a Sign-On Bonus in the gross amount of Five Hundred Thousand Dollars ($500,000.00) (the "**Bonus**"). Company will pay the Bonus in ten (10) installments in the amount of $50,000.00, through its regular payroll at the end of the first and tenth payroll periods subsequent to the Employee's first day of employment (the "**Start Date**"), with the first payment on February 23, 2024, and the final payment on July 10, 2024. The Bonus shall be subject to all applicable taxes, withholdings, and voluntary deductions. The Parties agree that:

☒   $500,000.00 of the Bonus is an **unvested wage advance**. Employee will earn the advance in its entirety by remaining employed with Company for thirty-six (36) months following the Start Date. **The Parties further agree that no portion of the advance shall be earned if Employee does not remain employed with Company for the full thirty-six (36) months**. Stated differently, if Employee does not remain employed with Company for thirty-six (36) months, Company may require Employee to pay back the bonus in full pursuant to paragraph 3, below. Time of employment less than thirty-six (36) months, including partial months of employment, does not reduce the repayment obligation under this Agreement. **Repayment of Bonus.** Employee agrees to repay to Company the entire Bonus amount according to the following terms:

a.      Termination of Employment. If Employee separates from employment with Company, regardless of the reason, whether voluntary or involuntary, prior to thirty-six (36) months after the Start Date, then Employee agrees to repay the entire unvested wage advance portions of the Bonus within ten (10) days of the separation date. Employee further agrees that any outstanding balance on such repayment obligation is delinquent and immediately collectable following the tenth (10th) day after the separation date.

b.      Consent to Offset. By signing below, Employee expressly gives Company a lien against any wages, accrued vacation time, incentive compensation payments, bonuses and/or commissions due to Employee on or after the date of Employee's separation of

employment. Employee agrees that Company may deduct, to the extent permitted by applicable law, the repayment amount due Company under this Agreement from any amounts due Employee. Employee also agrees that any tax consequences borne because of repayment of the Bonus will be the sole and exclusive responsibility of Employee.

3.    **Further Assurances.** Employee agrees to execute, acknowledge, and deliver or cause to be executed, acknowledged, and delivered all such further documents Company reasonably deems necessary or appropriate to carry out the terms and provisions of this Agreement.

4.    **At-Will Employment.** Nothing in this Agreement guarantees employment for any period of time. Employee shall be and remain an employee "at will".

5.    **Acknowledgements and Integration.** Employee acknowledges and agrees that Company has granted Employee sufficient time to review the Agreement, including allowing Employee to freely review or discuss the terms of this Agreement with any lawyer of Employee's choosing prior to signing. Employee further acknowledges that Employee is voluntarily entering into this Agreement without any duress or pressure from Company. Employee agrees this Agreement is the entire agreement between the Parties with respect to the subject matter herein, and Employee acknowledges Company has not made any other statements, promises or commitments of any kind (written or oral) to cause Employee to agree to the terms of this Agreement.

6.    **Waiver.** The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver nor shall it deprive such Party of the right thereafter to insist upon strict adherence to that that term or any term of this Agreement. Any waiver must be in writing signed by the waiving Party. If Company is the waiving Party, such waiver must be signed by Company's Chief Executive Officer.

7.    **Modification.** The portion of the Bonus considered earned wages may be supplemented, amended, or modified only by the mutual agreement of the Parties. No supplement, amendment, or modification of the earned wages portion of the Bonus shall be binding unless it is in writing and signed by the Employee and Company's Chief Executive Officer. Company shall have the right, at any time, to modify the unvested wage advance on a prospective basis upon advance notice to Employee.

8.    **Severability.** The Parties agree that should a court of competent jurisdiction declare or determine any provision of this Agreement to be illegal, invalid or unenforceable, the remainder of the Agreement shall nonetheless remain binding and enforceable and the illegal, invalid or unenforceable provision(s) shall be modified only so much as necessary to comply with applicable law.

9.    **Successors and Assignment.** This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors, heirs and permitted assigns. Employee may not assign Employee's rights and obligations under this Agreement without prior written consent of Company. Company may assign this Agreement and/or its rights or obligations

under this Agreement. Any and all rights and remedies of Company under this Agreement shall inure to the benefit of and be enforceable by any successor or assignee of Company.

10. **Choice of Law; Waiver of Jury Trial.** This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (without regard to any conflicts of laws principles thereof that would give effect to the laws of another jurisdiction). Employee intends to and hereby confers jurisdiction upon the courts of the State of New Jersey and U.S. federal courts located within the State of Jersey to determine any dispute arising out of or related to this Agreement, including the enforcement and the breach hereof. Employee waives any objection to venue in such courts. Each Party irrevocably waives its rights to trial by jury in any action or proceeding arising out of this Agreement.

11. **Attorneys' Fees.** Employee agrees to pay all reasonable costs, expenses, interest, and legal fees incurred by the Company to enforce this Agreement.

12. **Electronic Signature.** Employee agrees that Company may enforce this Agreement with a copy for which Employee has provided an electronic signature, and that such electronic signature may be satisfied by procedures that Company or a third party designated by Company has established or may establish for an electronic signature system, and Employee's electronic signature shall be the same as, and shall have the same force and effect as, Employee's written signature. By electronically accepting this Agreement, Employee agrees to the following: "This electronic contract contains my electronic signature, which I have executed with the intent to sign this Agreement."

13. **Priority of Agreements.** In the event of a conflict between the express terms of this Agreement and any other agreements between Employee and Company, including but not limited to any Loan Originator Contract, Branch Manager Contract, Confidentiality Agreement, and/or Arbitration Agreement, this Agreement shall control, unless the conflicting agreement expressly states it controls with regard to the terms at issue. For clarity, the terms of this Agreement shall not be subject to any Arbitration Agreement or dispute resolution provision between the Parties.

**IN WITNESS WHEREOF,** the Parties executed this Agreement as of the date first written above.

**EMPLOYEE**

**COMPANY**
**American    Neighborhood    Mortgage Acceptance Company LLC, d/b/a AnnieMac Home Mortgage**

By:

Mona Lea Edick
Mona Lea Edick

Joseph Panebianco
CEO